UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THEODORE URBAN and
JENNIFER URBAN

                    Plaintiffs,                    Case No. 1:22-cv-11079

v.                                       Honorable Thomas L. Ludington
                                             United States District Judge

CITY OF ROGERS CITY, et al.,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND DISMISSING PLAINTIFFS' COMPLAINT**

For over 30 years, Plaintiffs Theodore and Jennifer Urban have owned and operated Dry Dock Sporting Goods, a small store adjacent to a car dealership in Rogers City, Michigan. In 2019, the car dealership was purchased by Tom Bishop, a Cheboygan resident, who offered to buy the Dry-Dock property from the Urbans. The Urbans declined Bishop's offer, and shortly thereafter, disputes between the Urbans and Bishop began. On two separate occasions, incidents between Theodore and Bishop's employees resulted in Theodore's arrest, after the relevant police reports were reviewed by the prosecutor and arrest warrants were issued.

All charges against Theodore were eventually dismissed, but he now brings 42 U.S.C. § 1983 claims against the four police officers who investigated both incidents. Theodore alleges he was falsely arrested in violation of the Fourth Amendment because these officers made false statements in their incident reports. He also alleges the City of Rogers City is liable, as a municipality, for this Fourth Amendment violation. And the Urbans jointly allege that all Defendants tortiously interfered with a business relationship.

All Defendants have moved for summary judgment, arguing there was probable cause for both arrests, thus all claims against the police officers and Rogers City relating to the arrests should be dismissed, and that Plaintiffs have not satisfied the elements for a claim of tortious interference with a business relationship under Michigan law.

## I.

### A.

Plaintiff Theodore Urban is a lifelong resident of Rogers City, Michigan. *See* ECF No. 33-2 at PageID.262. In 1990, he married Plaintiff Jennifer Urban and opened Dry Dock, and outdoor sporting goods store, at 450 North Bradley Highway. *Id.* at PageID.263. Dry Dock sells a variety of outdoor sporting goods, including fishing supplies, bows and arrows, and guns, as well as beer and wine. *Id.* at PageID.262–63. The Urbans operate Dry Dock themselves and do not maintain any employees. *Id.* at PageID.264.

In addition to Dry Dock, the Urbans opened two motels in 2013: Rogers City Motel, a 13-unit motel located "a few blocks" from Dry Dock, and Rogers City Extended Stay Motel, an eight-unit motel behind Dry Dock. *See* ECF No. 33-2 at PageID.264, 293. The Urbans work with the Michigan Department of Corrections (MDOC) and lease some rooms at both motels to recent MDOC parolees. *Id.* at PageID.264–65 (detailing how MDOC contacts the Urbans to place parolees at the one of the Urbans' motels and the Urbans "generally" receive a "set fee" from MDOC for each parolee housed at the motels).

Since the Urbans opened Dry Dock in 1990, it has shared a boundary line with a car dealership. *Id.* at PageID.266. In 2019, Tom Bishop purchased the car dealership, and it was renamed Bishop Chevrolet. *See* ECF No. 33-9 at PageID.410. After purchasing the dealership, Bishop "came over" to Dry Dock and offered to purchase the Dry Dock property for $170,000.

ECF No. 33-2 at PageID.267. Theodore initially "accepted" Bishop's offer, but Bishop then told Theodore "that he wanted to do a land contract," and Theodore would only accept a cash deal, so he declined Bishop's offer. *Id.* Although Theodore reported he was not upset about their inability to reach an agreement, he believed Bishop was disappointed that the sale did not occur because "he wanted to expand" the dealership. *Id.* at PageID.267–68.

**B.**

In late 2019 or early 2020, a series of disputes between the Urbans and Bishop Chevrolet relating to snowplowing began. *See* ECF No. 33-9 at PageID.411

First, the Urbans and Bishop Chevrolet disagreed about where the boundary line between their properties was, and both Theodore and Bishop Chevrolet complained that the other was "plowing snow up against" their property. ECF No. 33-9 at PageID.411. Defendant Jamie Meyer, the Rogers City Police Chief, resolved the issue by suggesting both "put [the snow] somewhere else." *Id.*

But a few months later, Jennifer Urban complained that Bishop Chevrolet was violating state law by plowing snow across a city street to another property Bishop owned. ECF Nos. 33-2 at PageID.271; 33-9 at PageID.411; 33-10 at PageID.449, 451. Defendant Meyer spoke with Warren Chamberlain, the manager of Bishop Chevrolet, about the issue, and told Chamberlain that Bishop Chevrolet would receive a citation if they plowed snow across a city street again. ECF No. 33-9 at PageID.411.

In response, Chamberlain contacted Defendant Meyer to ask if they could use a front-end loader to pick up the snow and transport it across the street "in the air." ECF No. 33-10 at PageID.452. Defendant Meyer advised Chamberlain that moving the snow that way would not be a violation of law. ECF No. 33-9 at PageID.412. But soon after, the Urbans complained to

Defendant Meyer about how much snow fell on the public road when it was transported in the front-end loader and asked Defendant Meyer to "watch" Bishop Chevrolet move the snow. ECF No. 33-9 at PageID.412.

During the snowplow disputes, Bishop sought permission from Rogers City to "annex" part of Hemlock Street behind the dealership to plow snow across the road.[1] ECF No. 33-10 at PageID.452. Importantly, both Bishop Chevrolet and Dry Dock have back entrances on Hemlock Street. ECF No. 33-2 at PageID.283. According to Theodore, many of his local customers use the back entrance on Hemlock Street. *Id.*

In late January 2020, Bishop attended a Rogers City Council meeting to request a "temporary road closure" of Hemlock Street to plow snow. ECF No. 33-5 at PageID.341. The City Council was amenable to Bishop's request, but Bishop lamented about how he was investing "nearly a million dollars" in Rogers City, and he was frustrated that "someone would have the audacity to tell my guy not to plow snow across the road." ECF No. 33-5 at PageID.348; *see also* ECF No. 33-9 at PageID.412 ("[Bishop told] the council that he can't believe that they employ a police chief that has the audacity to tell him that he can't push snow across the road."). Bishop also expressed frustration about Theodore, calling him "the worst of all people," and criticized the council for "sitting here talking about [Bishop Chevrolet] putting snow across the road" while "let[ting] Theodore run a filthy, filthy business for years." *Id.* at PageID.347. After the meeting, Theodore heard about Bishop's comments at the meeting, and stated he had "some bad feelings" after hearing what Bishop said about him and his business. ECF No. 33-2 at PageID.272.

---

[1] Allegedly, Bishop had a similar arrangement with the city of Cheboygan, where his other car dealership was located. ECF No. 33-10 at PageID.452.

According to Theodore, after receiving permission from the City, Bishop Chevrolet closed Hemlock Street "dozens" of time for snowplowing, for up to four hours at a time, ECF No. 33-2 at PageID.283. But, according to Bishop Chevrolet's manager, they only closed Hemlock Street "maybe three" times a year to plow snow, and for no more than an hour. ECF No. 33-10 at PageID.450, 452. And even when Hemlock Street was temporarily closed so Bishop Chevrolet could plow, customers still had access to Dry Dock from at least one other road. *See* ECF Nos. 33-10 at PageID.452; 33-2 at PageID.283–84.

## C.

A few months later, Bishop Chevrolet started "remodeling" the dealership by renovating the roof, installing a large sign, and "re[doing] the whole building." *Id.* at PageID.269. During the remodeling, Theodore alleges Bishop employees and contractors trespassed on Dry Dock's property daily.   *Id.* Around the same time, the Urbans and Bishop Chevrolet began filing complaints about the other's businesses. ECF No. 33-9 at PageID.416. Bishop or his employees complained about the Urbans walking in front of the dealership, *id.*, and parking their trailer on Bishop Chevrolet's property. *Id.* at PageID.421. Although the second complaint was investigated, both the Rogers City Attorney and the prosecutor declined to issue a citation or press charges. *Id.* The Urbans complained about noise and construction debris from Bishop Chevrolet's renovations, *id.*; ECF No. 33-16 at PageID.542, and complained that a dumpster was placed on city property, ECF No. 33-9 at PageID.416. Jennifer also alleged that a Bishop employee told a customer to walk through Dry Dock's property, though an investigation proved this allegation was not true. ECF No. 33-7 at PageID.374. At one point, Theodore grew so frustrated with the disputes that he told a friend that he wanted to kill Bishop. ECF Nos. 33-2 at PageID.273; 26-3 at PageID.140. And a friend of the Urbans told them that Bishop "offered [someone] a certain amount of money to harm

or kill [Theodore]." ECF No. 33-16 at PageID.543. The police investigated the latter allegation and interviewed witnesses who said "they never heard anything of the sort." *Id.* at PageID.544.

### D.

In May 2020, as part of the remodeling process, Bishop hired surveyors to survey his property. ECF No. 33-2 at PageID.274–75. On May 19, 2020, a surveyor reported to Rogers City Police that Theodore "approached him and threatened to prosecute" if the surveyor stepped on Dry Dock's property. ECF No. 26-4 at PageID.145. The next day, the Bishop Chevrolet manager, Chamberlain, called the Rogers City Police and complained that Theodore ran over a survey stake with his tractor. *See* ECF No. 33-210 at PageID.454. Defendant Bradley Haske, a Rogers City Police Officer, responded by driving to Bishop Chevrolet and speaking with Chamberlain. ECF No. 33-7 at PageID.382. According to Haske, a Bishop Chevrolet employee showed Haske to "the scene" of the broken survey stake, and Theodore was outside. *Id.* at PageID.387. At that point, according to Haske, Theodore and the Bishop employee started going "back and forth," so Haske "asked the Bishop employees to go inside the building while [he] finished looking over the scene." *Id.* at PageID.387.

Defendant Haske's police report states that, at this point "[Theodore] walked over and asked if [Haske] needed to talk to him," and that "[Theodore] told [Haske] that the surveyor broke the stake off, but he did run over the small part that was sticking out of the ground." ECF No. 26-3 at PageID.139. But Theodore claims he never spoke with Defendant Haske on May 20, 2020, that he did not use his tractor that day, and that he didn't know anything about the broken stake until June 1, 2020. ECF No. 33-2 at PageID.276, 278.*id.* Notably, although Defendant Haske testified that he thought he activated his body camera, it was not activated and did not record the

interaction, so there is a factual dispute about whose account is true, *see* ECF No. 33-7 at PageID.383, 385.

Defendant Haske submitted the incident report and photos showing the tractor tracks over the broken stake to Defendant Meyer for his review. ECF No. 33-7 at PageID.389. Defendant Meyer reviewed Defendant Haske's report, added a May 22, 2020 incident report that Theodore said he would kill Bishop, *see* ECF No. 26-3 at PageID.140, and sent the combined incident report to the prosecutor on either May 22 or May 23, 2020, ECF No. 33-9 at PageID.419. Although the prosecutor decides what charges, if any, to pursue, Defendant Meyer submitted the incident report and warrant request to the prosecutor "requesting" charges for malicious destruction of property (MDOP) less than $200 and harassment. ECF No. ECF No. 33-6 at PageID.364; *see also* ECF No. 33-9 at PageID.418. The prosecutor reviewed the report and photos, "and prepared and authorized a misdemeanor complaint and warrant on May 27, 2020" for malicious destruction of property less than $200. ECF No. 26-9 at PageID.172. Defendant Meyer swore to the complaint, and a magistrate reviewed the complaint and warrant request before signing the warrant for Theodore's arrest on June 1, 2020. ECF Nos. 33-9 at PageID.419; 33-8 at PageID.403.

Thereafter, Defendant Meyer arrived at Theodore's house with the arrest warrant. ECF No. 33-2 at PageID.278; *see also* ECF No. 33-9 at PageID.420. Defendant Meyer told Theodore he could follow Defendant Meyer down to the police station, which Theodore did. ECF No. 33-2 at PageID.278. Theodore was at the police station for "a couple hours," but was never placed in jail and was released on bond. *Id.*

### E.

Two months later, the Rogers City Police Department received a call from Lisa Schellie, a Bishop Chevrolet employee. *See* ECF Nos. 26-6 at PageID.152; 33-11 at PageID.471–72.

According to Schellie, she was riding bikes with her grandson in Rogers City and stopped at the intersection of First Street and Huron Street. ECF No. 33-11 at PageID.477–78. While she was stopped, she was "showing [her grandson] who had the right-of-way and who didn't have the right-of-way." *Id.* at PageID.478. After traffic cleared, Schellie and her grandson "started pedaling" across Huron Street. *Id.* "At that point, [Schellie] looked up and [saw a] silver truck coming at closer to [them.]" *Id.* Schellie testified she made eye contact with the driver of the silver truck, and "realized" it was Theodore. *Id.* The silver truck—that Schellie alleges was being driven by Theodore—did not activate its turn signal, but "proceeded to turn into the intersection." *Id.* Schellie testified the silver truck then "came so close to [her] bicycle that [she] could [have] reached out without extending [her] arm at full arm's length and touched [the] truck." *Id.* Schellie "got [her grandson] up onto the sidewalk," told him they were going home, and called the Rogers City Police. *Id.* at PageID.478–79. Schellie testified she "talked to dispatch" about the incident, ECF No. 33-11 at PageID.483, and that Defendant John Alley, a Rogers City Police Officer, then came over to her house and they "spoke in [Schellie's] living room." ECF No. 33-11 at PageID.477.

Defendant Alley's initial police report, however, does not mention any conversation with Schellie after the initial report. ECF No. 26-6 at PageID.152. It merely notes that, in response to Schellie's report, Defendant Alley "looked in the area for [Theodore] and could not find him." *Id.* Five days later, Defendant Meyer updated the incident report noting that Schellie called to inquire about her complaint and "asked what the incident report stated." *Id.* After Meyer "explained" the incident report, Schellie complained that "the entire incident [was] not documented in the report." *Id.* In response, Defendant Meyer transcribed what Schellie told him over the phone: "that Mr. Urban totally disregarded the fact that he did not have the right-of-way and almost hit her while she was on her bike," that Schellie "was terrified and felt she was going to be struck by Mr. Urban's

truck," and that Schellie believed "this was definitely an intentional act as Mr. Urban was glaring at her while he was going through the intersection." *Id.*

Later that day, Defendant Alley "contacted" Theodore at his home to inquire about the incident. ECF No. 26-6 at PageID.152. This interaction is documented in the incident report and was recorded by Defendant Alley's bodycam. Both the incident report and the bodycam footage reflect that Theodore told Defendant Alley that he was out of town at his hunting cabin to celebrate his birthday and that he didn't return to Rogers City until "the afternoon" on August 9, 2020, the date Schellie alleged Theodore almost hit her. *Id.*

After talking to Theodore, Defendant Alley called Schellie and told her that Theodore reported being out of town when the incident occurred. *Id.* at PageID.153. He asked Schellie how certain she was that Theodore was driving the truck and Shellie responded that "she has known [Theodore] her whole life and . . . is certain it was him and his pickup." *Id.* Three days later, Defendant Alley made another entry in the incident report noting that he received a timestamped photo from Bishop Chevrolet that showed Theodore in his truck at Dry Dock at 10:38 AM on August 9, 2020. *Id.* The incident report reflects that Schellie "stated that [the photo] should prove that [Theodore] is lying about not coming back to town from his hunting camp until the afternoon" that day. *Id.* Defendant Alley attached the photo to the incident report, *See* ECF No. 26-6 at PageID.155, 160, and sent it to Defendant Meyer for his review, ECF No. 33-12 at PageID.508.

Defendant Meyer reviewed the incident report and sent it to the prosecutor without suggesting any specific charges, ECF No. 33-9 at PageID.428; *see also* ECF No. 33-13 at PageID.521 (requesting only "[p]rosecutor [r]eview" of the report). On September 14, 2020, the prosecutor, after reviewing Defendant Alley's report and bodycam footage, prepared and

authorized a misdemeanor complaint and a warrant for Theodore's arrest for assault.[2] ECF No. 26-9 at PageID.173; *see also* ECF No. 26-7 at PageID.162. After the prosecutor issued the complaint and arrest warrant, Defendant Meyer directed Defendant Bruce Collins, a Rogers City Police Officer, to swear to some complaints at the courthouse, including the misdemeanor assault complaint against Theodore. ECF No. 33-16 at PageID.545. After reviewing the sworn complaint and warrant request, a magistrate judge authorized the warrant for Theodore's arrest. ECF No. 26-7 at PageID.162. Defendant Meyer notified Jennifer about the warrant and told her that Theodore "need[ed] to turn himself in at his earliest convenience." ECF No. 33-9 at PageID.425. Theodore turned himself in that same day, *id.* at PageID.425–26, and was placed in the library for "four and a half hours" before being released on bond. ECF No. 33-2 at PageID.281–82.

### F.

After Theodore's September 2020 arrest, Defendant Meyer requested a special prosecutor, ECF No. 33-9 at PageID.426, but the local prosecutor did not seek appointment of a special prosecutor until July 2020, *see* ECF No. 33-22 at PageID.577–78. Eventually, both of Theodore's charges were referred to a special prosecutor in Alpena County, who moved to dismiss the assault charge on March 4, 2021. ECF No. 33-17 at PageID.563. The remaining charges—for MDOP and reckless driving—were both dismissed in November 2021. ECF Nos. 33-18 at PageID.567–67 (discussing dismissal of both cases without prejudice); 33-19 (granting prosecutor's motion for a *nolle prosequi* and dismissing malicious destruction of property charge without prejudice); 33-20 (same for reckless driving charge). According to Defendant Meyer, the two charges were

---

[2] On March 4, 2021, the prosecutor submitted an amended misdemeanor complaint adding a charge of reckless driving. *See* ECF No. 26-7 at PageID.163.

dismissed because the special prosecutor did not want to take either case to trial. ECF No. 33-9 at PageID.427.

On May 18, 2022, both Theodore and Jennifer sued Defendants Alley, Collins, Haske, Meyer, and the City of Rogers City. ECF No. 1. As only *Theodore* was arrested, he alone alleges all officer Defendants violated his Fourth Amendment rights by arresting him twice without probable cause. *See id.* And he alleges the City of Rogers City is liable for those Fourth Amendment violations as a municipality under *Monell* because its failure to adequately train and supervise its officers regarding probable cause determinations caused his constitutional injuries. *Id.* at PageID.8-10. Theodore and Jennifer jointly allege that Defendants tortiously interfered with a business relationship, in violation of Michigan law. *Id.* at PageID.7.

Notably, as of March 2023, Defendant Meyer described the current relationship between the Urbans and Bishop and his employees as "much quieter." ECF No. 33-9 at PageID.427.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of "identifying" the record evidence "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). A genuine issue of fact requires more than "a mere scintilla of evidence," *id.* at 251, more than "some metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Throughout its analysis, the court must draw all reasonable inferences in favor of the nonmovant to determine "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

## III.

Theodore alleges Defendants arrested him without probable cause on June 1, 2020, and September 15, 2020, in violation of the Fourth Amendment. No.1 at PageID.5–7. He also asserts a *Monell* claim against Rogers City for failing to train and supervise its officers regarding probable-cause determinations. *Id.* at PageID.8–10. And both Theodore and Jennifer allege a state-law claim for tortious interference with a business relationship. *Id.* at PageID.7–8. Each claim will be discussed in turn.

### A. Fourth Amendment Violations

#### 1.

In order to prevail on a 42 U.S.C. § 1983 claim, a plaintiff must prove that he was deprived of "a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Fourth Amendment guarantees the right of persons to be free from "unreasonable searches and seizures," U.S. CONST. amend. IV, which includes the right to be free from "arrest without probable cause." *Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020). "To prevail on a

false-arrest claim under § 1983, 'a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff.'" *Id.* (quoting *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)).

In circumstances where the plaintiff was arrested according to an arrest warrant issued by a judge—as is the case here—the plaintiff must make a "substantial showing" that the sworn statements supporting the arrest warrant included materially false statements made in knowing or reckless disregard for the truth. *Tlapanco v. Egles*, 969 F.3d at 652; *see also Manuel v. City of Joliet*, 580 U.S. 357, 367, (2017) (explaining Fourth Amendment violations "can occur" when "a judge's probable-cause determination is predicated solely on a police officer's false statements" in the arrest warrant.).

"A plaintiff shows substantial evidence of deliberate falsehood or reckless disregard when, for example, he presents proof that at the time the officer swore out the affidavit, [the officer] knew of or possessed information that contradicted the sworn assertions." *Butler v. City of Detroit*, 936 F.3d 410, 419 (6th Cir. 2019).[3] Importantly, to show deliberate falsehood or reckless disregard, a plaintiff must point to something more than his own testimony that "simply contradict[s] the warrant affidavit," and "there must be evidence going to the officer's knowledge or state of mind at the time the officer wrote the allegedly false affidavit." *Id.* If, however, a plaintiff presents substantial evidence of a deliberate falsehood or reckless disregard, "the Fourth Amendment requires the court to 'set aside the [false] statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause.'" *Tlapanco v.*

---

[3] This standard is "derived . . . from the Supreme Court's decision in *Franks v. Delaware*," which articulates the burden a defendant in a criminal case must satisfy for a court to hold an "evidentiary hearing to prove [the defendant's] allegations that officers [] made false statements in their search warrant affidavits." *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019).

*Elges*, 969 F.3d 638, 652 (6th Cir. 2020) (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)).

**2.**

Plaintiff alleges Defendants Meyer and Haske violated his Fourth Amendment rights by arresting him on June 1, 2020 for MDOP without probable cause. ECF No. 1 at PageID.4. Similarly, he alleges Defendants Meyer, Collins, and Alley violated his Fourth Amendment rights by arresting him on September 15, 2020 for misdemeanor assault and battery without probable cause. *Id.* at PageID.5. Each arrest will be discussed in turn.

**i. June 1, 2020 Arrest**

Defendants argue there was probable cause for the June 2020 arrest because Theodore was arrested according to a valid arrest warrant signed by a neutral magistrate. ECF No. 26 at PageID.116–18. But Theodore argues that Defendant Haske made knowingly false statements in his warrant application, thus rendering the arrest a violation of his Fourth Amendment rights. ECF No. 33 at PageID.230–31.

Specifically, Theodore alleges that Defendant Haske made three false statements: (1) that Defendant Haske spoke with Theodore on May 20, 2020; (2) that Theodore admitted to running over the stake after it had already been broken by the surveyor; and (3) that there was a video "showing [Theodore] backing his tractor up toward the stake." *Id.* at PageID.231. According to Theodore, he never spoke with Defendant Haske on May 20, 2020, and the video does not show *him* backing his tractor up toward the stake, but some other, unidentifiable person. *Id.*

But even *assuming* Theodore's version of events is true and that these three statements in Defendant Haske's incident report are false, "simply contradicting" statements in a warrant-request affidavit is not enough to prevail on a false arrest claim. *Butler v. City of Detroit*, 936 F.3d

- 14 -

410, 419 (6th Cir. 2019). And beyond those limited contradictions, Plaintiff has not provided "substantial" evidence of deliberate falsehood or reckless disregard as to Defendant Haske. *See Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020). Indeed, Plaintiff has pointed to "*no* evidence from which [a factfinder] could infer a culpable mental state." *Butler*, 936 F.3d at 421 (6th Cir. 2019) (emphasis added). And, to prevail on a false arrest claim, "there must be evidence of more than mere factual inaccuracy." *Id.* at 420.

Moreover, even if Theodore *had* made the required "substantial showing" regarding Defendant Haske's mental culpability for these allegedly false statements, the remaining information in the warrant affidavit sufficiently established probable cause. Removing the three disputed statements from the incident report attached to the warrant application, the warrant application still shows that:

1. Chamberlain told Haske that Theodore drove over the survey stake that was in the ground;
2. "[T]here were clear tractor tracks over top of the stake in the ground that led right to the Ford tractor that was parked near the stake on the property line;
3. There was a photo of the stake in tact at 10:47 AM on May 20, 2020;
4. There was video of *someone* backing the blue tractor up toward the stake at 11:02 AM on May 20, 2020;
5. There was a photo of the broken stake at 2:00 PM on May 20, 2020;
6. Chief Meyer received a report from a Bishop Chevrolet employee two days later that the employee heard Theodore say that he "will fucking kill that Tom Bishop," and that Theodore "ha[d] not stopped harassing Bishop [Chevrolet] employees; and
7. There were "ongoing and continuous acts by Theodore against Bishop Chevrolet.

*See* ECF No. 26-3 at PageID.139–143.

Considered together, these events—which Theodore does not dispute—establish probable cause. True, these events are not *direct* evidence of malicious destruction of property. But probable cause does not require direct evidence. *See United States v. Glowacki*, No. 22-3279, 2023 WL 179887, at *5 (6th Cir. Jan. 13, 2023) (noting the proper assessment for probable cause is not

"whether particular conduct is innocent or guilty, but rather the degree of suspicion that attaches to particular types of noncriminal acts"), *cert. denied*, 143 S. Ct. 1042 (2023) (quotations omitted).

In sum, Theodore has not identified *any* evidence that Haske or Meyer acted with deliberate falsehood or reckless disregard such that their warrant application was invalid. And even if he did, the remaining statements in the warrant application still establish probable cause such that the warrant—signed by a neutral magistrate—is valid. Thus, Defendants did not violate Plaintiff's Fourth Amendment rights when arresting him in June 2020.

### ii. September 15, 2020 Arrest

Defendants again argue that there was probable cause for the September 2020 arrest because Theodore was arrested according to a valid arrest warrant signed by a neutral magistrate. ECF No. 26 at PageID.118–22. Theodore responds, again, that although the arrest warrant was signed by a magistrate, Defendants Alley, Meyer, and Collins made knowingly false statements in the incident report attached to the arrest-warrant application, thus rendering the arrest a violation of his Fourth Amendment rights. ECF No. 33 at PageID.232–37.

Theodore alleges the following two statements in the September 2020 warrant application are false:

1. Schellie contacted Defendant Alley by calling him at the police department to report the incident; and
2. Theodore told Officer Alley that he was out of town and did not return to Rogers City until the afternoon of August 9, 2020.

ECF No. 33 at PageID.244. According to Theodore, Schellie's deposition testimony demonstrates that she did not call the police department directly and instead called 911 and spoke with a dispatcher first. *Id.*; *see also* ECF No. 33-11 at PageID.483 ("I talked to dispatch first."). And Theodore argues he never said he didn't return to Rogers City until the afternoon on August

9, 2020, but only that *he didn't know* what time he came back that Sunday. ECF No. 33 at PageID.244.

But, again, to prevail on a false-arrest claim based on a false statement in a warrant application, "there must be evidence of more than mere factual inaccuracy." *Butler*, 936 F.3d at 420 (6th Cir. 2019). And Ted points to no evidence of any Defendant's mental state to show that either of the alleged false statements was made deliberately or with reckless disregard for the truth.

Theodore points to Defendant Alley's bodycam footage to suggest that Defendant Alley knew Theodore never said he didn't return to Rogers City until the afternoon, but the footage merely corroborates the accuracy of Defendant Alley's incident report. True, the body camera footage shows that Theodore never said *verbatim* that "he didn't come back into town until the afternoon" that Sunday. *Compare* ECF No. 33-13 ("Ted stated he was out of town at his hunting cabin and didn't come back into town until the afternoon on 08/09/2020.") *with* Alley Cam ("I wasn't here."); *see also* ECF No. 33-15 at PageID.530. But when Defendant Alley asked Theodore if he was "in town that morning," Theodore responded, "No, I wasn't here." Alley Cam at 2:18–2:24. And later, when Defendant Alley asked Theodore what time he returned on Sunday, Theodore said he didn't know, but Jennifer responded "sometime in the afternoon," to which Theodore responded, "I think so." Alley Cam at 2:50–3:00; *see also* ECF No. 33-15 at PageID.531. In sum, the bodycam footage does not demonstrate that Defendant Alley had "serious doubts as to the truth of his statements" in the incident report or had "obvious reasons to doubt the accuracy of the information he reported." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010). To the contrary, it corroborates the accuracy of his notes in the incident report. True, Defendant Alley's report does not quote Theodore's exact statements. But it conveys Theodore's ultimate message:

- 17 -

that he was not the one driving the silver pickup that threatened Schellie because he "wasn't here" the morning it occurred. Alley Cam at 2:18–2:24.

And setting the two disputed statements aside, the remaining information establishes probable cause. Removing the two disputed statements from the incident report attached to the warrant application, the warrant application still provides that:

1. On Sunday, August 9, 2020, at 10:40 AM, Schellie reported that a silver pickup truck almost hit her and her grandson while they were riding bikes;
2. Schellie reported it was Theodore driving the silver pickup;
3. Defendant Alley "looked in the area" for Theodore but did not find him;
4. On August 14, 2020, Defendant Alley contacted Theodore and Theodore reported he "was out of town" on August 9, 2020;
5. Theodore had no knowledge of the August 9, 2020 incident with Schellie;
6. On August 14, 2020, Defendant Alley contacted Schellie and asked how certain she was it was [Theodore]" driving the silver pickup, and she responded that she had known Theodore her whole life and is certain it was him;
7. On August 17, 2020, Defendant Alley "obtained a compact disc from Bishop Chevrolet" showing a photo of Theodore in his truck at Dry Dock timestamped August 9, 2020 at 10:38 AM; and
8. The timestamped photo of Theodore's silver pickup at Dry Dock on August 9, 2020 at 10:38 AM.

*See* ECF No. 33-13 at PageID.521–26.

This information—which Theodore does not dispute—establishes probable cause. Again, although these events are not *direct* evidence of assault, probable cause does not require direct evidence. *See United States v. Glowacki*, No. 22-3279, 2023 WL 179887, at *5 (6th Cir. Jan. 13, 2023) (noting the proper assessment for probable cause is not "whether particular conduct is innocent or guilty, but rather the degree of suspicion that attaches to particular types of noncriminal acts"), *cert. denied*, 143 S. Ct. 1042 (2023) (quotations omitted).

In sum, Theodore has not presented any evidence that Defendants Alley, Collins, or Meyer made any statement in the incident report with *knowing* or *reckless* disregard for the truth, so his claim for false arrest will be dismissed. And even if he had made such a showing, there is still

probable cause in the warrant application after removing the two statements Theodore challenges as being false.

## B. *Monell* Municipality Claim

Theodore next alleges that Defendant Rogers City did not adequately train and supervise their officers on probable cause determinations, such that the city is liable under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). ECF No. 33 at PageID.250. But "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). Thus, because there was no underlying constitutional violation here, *see supra*, Sec. III.A., Theodore's *Monell* claim will be dismissed.

## C. Tortious Interference with a Business Relationship

Finally, Plaintiffs Theodore and Jennifer allege jointly that all Defendants "intentionally interfered with Plaintiffs' business relationships with their customers" by (1) knowingly and publicly providing false accusations of "criminal/illegal/immoral" activity against Plaintiffs and their business; (2) "harassing behavior"; (3) "blocking off, and /or allowing neighboring property owners to block off access to Plaintiffs' business(es)"; and (5) "allowing neighboring property owners to trespass onto Plaintiffs' property for purposes including, but not limited to, snow plowing." ECF No. 1 at PageID.7–8.

### 1.

To succeed on a claim of tortious interference with a business relationship or expectancy under Michigan law, a plaintiff must satisfy four elements: (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on a contract; (2) the defendant interferor's knowledge of the relationship or expectancy; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4)

resulting damage to the plaintiff. *Courser v. Allard*, 969 F.3d 604, 620–21 (6th Cir. 2020) (citing *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. Ct. App. 2005)).

"With respect to the third element, interference alone will not support a claim" of tortious interference with a business relationship. *Hope Network Rehab. Servs. v. Michigan Catastrophic Claims Ass'n*, 994 N.W.2d 873, 879 (Mich. Ct. App. 2022). In order "to satisfy the third element, the plaintiff must establish that the defendant acted both intentionally and either improperly or without justification." *Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439 (2018) (quotation marks and citation omitted). A tortious-interference-with-a-business-relationship claim requires an allegation "of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the . . . business relationship of another." *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002) (quotation marks and citation omitted). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Id.*

## 2.

Defendants argue that Plaintiffs have not established the third element of a tortious-interference-with-a-business-relationship claim because Plaintiffs have not identified "specific, affirmative acts" by any Defendant that rise to the level of a per se wrongful act or a lawful act carried out with malice and the intent to interfere with a business relationship. ECF No. 26 at PageID.127. Alternatively, Defendants argue all Defendants are entitled to governmental immunity. *Id.* at PageID.128.

Plaintiffs respond that they have provided "more than sufficient evidence of wrongful acts" and emphasize a recording of the January 2020 City Council meeting at which the City permitted

Bishop to seek permission from the city to close the road for snow plowing and makes a conclusory statement about the warrant requests being "untruthful" and "misleading." ECF No. 33 at PageID.251–52. And Plaintiffs assert that all Defendants except Defendant Meyer are not entitled to governmental immunity. *Id.* at PageID.252–54.

Under Michigan law, governmental agencies, including municipalities are immune from tort liability when they are "engaged in the exercise or discharge of a governmental function, i.e., an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." *Laurence G. Wolf Capital Mgt. Trust Agreement v. City of Ferndale*, 713 N.W.2d 274 (Mich. Ct. App. 2005); *see also* MICH. COMP. LAWS § 691.1407. And, importantly, "[t]here is no intentional tort exception to governmental immunity." *NL Ventures VI Farmington, LLC v. City of Livonia*, 886 N.W.2d 772, 785 (Mich. Ct. App. 2015) (citing *Harrison v. Director of Dep't of Corrections*, 487 N.W.2d 799, 802 (Mich. Ct. App. 1992)). "Whether an activity is a governmental function must be determined by the general activity and not the specific conduct involved at the time of the tort." *Id.* (citing *Tate v. Grand Rapids,* 671 N.W.2d 84, 87 (Mich. Ct. App. 2003)).

The temporary closure of a city road is a governmental function. *See* MICH. COMP. LAWS § 691.1402(1) ("Each governmental agency having jurisdiction over a highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel."); *see also* City of Rogers City Code of Ordinances (Jan. 31, 2022), Sec. 16-60 (authorizing temporary street closures when a street is "unsafe or temporarily unsuitable for use for any reason."). Accordingly, Defendant Rogers City is entitled to governmental immunity on Plaintiffs' tortious-interference-with-a-business-relationship claim because it was "engaged in the exercise or discharge of a governmental function." *also* MICH. COMP. LAWS § 691.1407(1).

Michigan law also grants governmental *officers and employees* immunity from intentional-tort liability so long as three criteria are satisfied. MICH. COMP. LAWS § 691.1407(2); *see also Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008) (summarizing the relevant test for individual governmental immunity). To establish entitlement to individual governmental immunity for an intentional tort, a defendant must show (1) "the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority"; (2) "the acts were undertaken in good faith, or were not undertaken with malice"; and (3) "the acts were discretionary, as opposed to ministerial." *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008).

All the individual officer Defendants here are entitled to governmental immunity under Michigan law. Plaintiffs only contest the second element, and asserts that "the evidence has overwhelmingly shown [that] the actions/inactions of Defendants were not only malicious, but were undertaken with a wanton or reckless disregard for Plaintiffs' rights." ECF No. 33 at PageID.254–55. But Plaintiff cites no evidence to support this claim. Indeed, as discussed above, Theodore presented *no evidence* of any officer Defendant's mental culpability when making the incident reports. And this Court finds none. Accordingly, all four officer Defendants are entitled to governmental immunity, so Plaintiffs' claims of tortious interference with a business relationship against Defendants Alley, Collins, Haske, and Meyer, will be dismissed.

## IV.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 26, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED WITH**

**PREJUDICE.**

**This is a final order and closes the above-captioned case.**

Dated: March 12, 2024                          s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge